# Richmond.

EFFINGER v. HALL.

NOVEMBER 19th, 1885.

1. WILLS—*Lost records—Copies—Evidence.*—Original will and will-book having been destroyed, and a copy previously made from said will-book, and exhibited in a suit, having been withdrawn by leave and recorded under Code 1873, chapter 172, a copy from the copy thus recorded must be taken, *prima facie*, as a true copy of the will.

2. IDEM—*Construction—Mistake—Correction—Case at bar.*—Will directs sale of land after death of wife, and division of proceeds, the language being : "That said house and lots of land be sold by my executor and the proceeds thereof be divided into seven equal parts ; one-seventh of which I give to the children of my brother, Thomas Hall, who may be living at the death of my wife ; one-seventh to the children of my brother, Robert Hall, who may be living at the last mentioned time ; one-seventh to each of my brothers and sisters hereinafter mentioned, that is, Robert, John, Edward, Mary Kyle, Jane Bogess and Diana." The widow died in 1879. Suit was instituted in 1881 to construe the will and sell the land.

HELD :

　　1. Testator intended to bequeath his property to eight persons or classes enumerated in his will. By manifest mistake the number of parts is styled "seven" instead of "eight," and each part is styled "one-seventh" instead of "one-eighth."

　　2. Equity hath power to correct such a mistake, and it is its duty to do so.

3. LEGACY IN FUTURE—*Statute of limitations—Laches.*—Where legacy is limited upon a future event, cause of action cannot accrue, nor statute of limitation begin to run, nor laches be imputed, until such event occurs.

4. BONA FIDE POSSESSORS— *Improvements— Compensation.* — Persons who occupy lands under defective titles and make thereon permanent and beneficial improvements with notice, *actual or constructive*, of the infirmity of their titles, cannot, upon the recovery of said lands by the rightful owners, obtain compensation for said improvements. Means of notice, with the duty of using those means, is equivalent to actual notice. *Lamar* v. *Hale*, 79 Va. 147.

5. IDEM—*Idem—Allowances by statute.*—Code 1873, chapters 131 and 132, provides for the allowance of compensation for improvements made by defendant on the premises "at a time when there was reason to believe the title good under which he was holding said premises." °

6. IDEM—*Judicial sales—Sales in pais.*—Purchasers at judicial sales may well presume that all things in the cause have been rightly conducted; but purchasers *in pais* are negligent if they fail to examine their chains of title.

7. EQUITABLE CONVERSION—*Election.*—Land directed to be sold, is at once stamped as personalty; and *vice versa.* Yet those entitled thereto may elect that it retain its original form, and prevent the actual conversion. *Harcum* v. *Hudnall*, 14 Gratt. 369.

Argued at Staunton and decided at Richmond.

Appeal from decree of circuit court of Rockingham county, rendered October 22d, 1884, in the chancery cause, styled *R. M. Hall et als.* v. *M. H. Effinger's Ex'or and als.*

The will of James Hall, of Harrisonburg, Virginia, admitted to probate in March, 1835, bequeathed his lots in that town, and his lands in that vicinity, to his wife during her life, and directed that at her death, his executor sell them and divide the proceeds into seven equal parts, "one-seventh of which," says the testator, "I give to the children of my brother, Thomas Hall, who may be living at the death of my wife; one-seventh to the children of my brother, Robert Hall, who may be living at the last mentioned time; one-seventh to each of my brothers and sisters hereinafter mentioned—that is, Robert, John, Edward, Mary Kyle, Jane Bogess and Diana." The widow married Dr. Doudall, and in 1884, they conveyed the life estate to John

Hall, Mary Kyle and Diana Hall, who, in 1846, conveyed same and their interests in remainder, to Henry Brown, to whom Jane Bogess and Edward Hall had conveyed their shares. Brown, in 1853, conveyed all their interests to Philip Liggett, to whom four of the eight children of Robert Hall also conveyed their interests. Thus Liggett acquired the life estate and eleven-sixteenths of the remainder, leaving the rest in Robert Hall, Edward W. Hall (the only child of Thomas Hall, deceased), and the other four children of Robert M. Hall.

In 1850, Liggett conveyed some fifteen acres, situated in the town, and afterwards divided into building lots, to M. Harvey Effinger, who afterwards, by deeds of different dates, conveyed the same to divers persons, who made thereon permanent and valuable improvements. In 1854, Liggett conveyed "a five acre mill lot" to Charles Weaver and others, and a tract of ninety-nine acres near Harrisonburg, to Peachy Wine.

In the deeds of conveyances to the several vendees and sub-vendees, there were references to the will of James Hall, deceased, and thus and otherwise, they had notice of the infirmity of their titles. The life estate terminated in 1879, by the death of Mrs. Doudall, and Robert Hall, Edward W., son of Thomas Hall, and the four children of Robert Hall instituted this suit against Effinger and the various persons in possession of said land, under deeds from Liggett, asking that the will be construed, that the land be sold, and that the proceeds be distributed.

Upon the hearing the circuit court construed the will to mean to divide the proceeds of the sale of the lands into eight equal parts; decided that the complainants were entitled to five-sixteenths of the lands without compensating the defendants for the improvements the latter had put upon them, and directed the sale of the lands. From this decree the defendants obtained an appeal and a writ of *supersedeas.*

Opinion states the points raised and other facts.

*G. W. Berlin, W. B. Compton* and *J. S. Harnsberger,* for the appellants.

*Robert Johnston* and *E. S. Conrad,* for the appellees.

LEWIS, P., delivered the opinion of the court.

The first question to be considered is, whether "Exhibit A," filed with the bill, is a true copy, as it purports to be, of the last will and testament of James Hall, deceased.

The appellants deny that it is.

It appears from the record that in February, 1835, the testator died, and that at the following March term of the county court of Rockingham county, his will was duly admitted to probate; that some years after the testator's death, and prior to the late war, an injunction bill was filed in the circuit court of Rockingham county by the administrator with the will annexed, against Peter B. Doudall and wife, the latter having been the widow of the testator, alleging the commission of waste by the defendants on the real estate devised, and that a duly authenticated copy of the will was filed as an exhibit with the bill in that suit; that during the war many of the public records of Rockingham county were destroyed, and among them the will of James Hall, and the will-book in which the same was recorded; and that after the termination of the war, leave was given to withdraw the copy of the will, filed in the injunction suit, for recordation in the clerk's office of the county court, and that Exhibit A, filed with the bill in the present suit, is a copy of the copy thus withdrawn and recorded.

It is very clear, therefore, in the light of these facts, and in the absence of any evidence whatever to support the contrary view, that the copy exhibited with the bill must be taken as a

true copy of the testator's will. Code 1873, chapter 172, sections five and twelve.

The next question relates to the construction of that clause of the will which directs a sale of the land, after the death of the wife, and a division of the proceeds. Its language is as follows: "That said house and lots of land above-mentioned, be sold by my executor, and the proceeds thereof be divided into seven equal parts; one-seventh of which I give to the children of my brother, Thomas Hall, who may be living at the death of my wife; one-seventh to the children of my brother, Robert Hall, who may be living at the last mentioned time; one-seventh to each of my brothers and sisters hereinafter mentioned—that is, Robert, John, Edward, Mary Kyle, Jane Bogess and Diana."

It is apparent that a mistake here occurs, which calls for correction in a court of equity, since it is not possible, consistently with the testator's intention, to divide the estate into seven parts only, when the direction is that it be equally divided among eight specified persons or classes. The power and duty of the court to make the proper correction is not denied. "In regard to mistakes in wills," says Judge Story, "there is no doubt that courts of equity have jurisdiction to correct them, when they are apparent upon the face of the will, or may be made out by a due construction of its terms; for in cases of wills the intention will prevail over the words. * * * So, if there is a mistake in the name, or description, or number of the legatees, intended to take, or in the property intended to be bequeathed, equity will correct it." 1 Story's Eq., sections 179, 180.

The same doctrine is laid down by Jarman, who refers to many cases to the same effect—among them to the case of *Tomkins* v. *Tomkins*, where a testator, after bequeathing £20 to his sister, gave to her *three* children £50 each, and the legatee had

*four.* Lord Hardwicke held that they were all entitled. "Again," says the same author, "in *Stebbing* v. *Walkey,* 2 Bro. C. C. 85, where a testator bequeathed certain stock unto ' the *two* daughters of T. in equal shares,' during their lives, and if *either* of them should die, then to pay the whole to the survivor during her life, and in case *both* should depart this life, then the whole to fall into the residue. At the date of the will T. had *three* daughters, all of whom were held to be entitled. So, in *Ganey* v. *Hibbert,* 19 Ves. 125, Sir W. Grant, on the authority of the last case, held *four* children to be entitled under a bequest 'to the *three* children of D.' of £600 each. In this case a question arose whether, in the adoption of this construction, the aggregate amount of the three legacies was to be divided among the four, or each of the four was to take a legacy of the same amount as was given to each of the three. The counsel for the legatees contended only for the former, but the M. R., on the authority of *Tomkins* v. *Tomkins, supra,* adopted the latter construction." 2 Jarman on Wills, 189. See also 2 Lom. Ex'ors, 29; 1 Redfield on Wills, 501.

The present case is even stronger for the appellees, since here all the legatees are mentioned by name, except "the children" of Thomas and Robert. The appellants, however, insist that the name of Robert should be rejected, as mistakenly, if not fraudulently, inserted in the will; but there is nothing in the case to support this position. The argument is, that "Robert was intended to get nothing," because "his children get one-seventh." "And where," it is asked, "is there any evidence to show a purpose on the testator's part to give the lion's share to Robert?" If by a "lion's share" is meant an eighth of the *residuum* of the estate, the answer is in the will itself, where Robert's name is deliberately written by the testator, whose object presumably was to provide for the designated legatees, rather than to divide his estate into any particular

number of parts. With equal, if not greater, plausibility, the argument might be applied to any one of the testator's sisters— Mary Kyle, Jane Bogess or Diana, or his brothers, John or Edward, for to each of them specific legacies are given, but not to Robert.

Nor has there been any acquiescence on the part of the latter in the construction of the will as now contended for by the appellants, which ought to estop him from asserting his claim as one of the legatees. The appellants' contention on this point is, that no such claim has ever been asserted by him until the institution of the present suit, and that " long acquiescence in a certain construction of a will, even if it be an erroneous construction, will be treated by the courts as the proper construction." But the obvious answer to this proposition is, that the will, having been duly recorded, gave notice of its contents, and that until the death of the life-tenant he had no claim which he was called upon to assert. The life-tenant, it seems, died in December, 1879, and the present suit was brought in 1881.

In *Ball* v. *Jackson's Ex'or*, 8 Gratt. 281, it was held that the statute of limitations did not commence to run against the owners of the remainder in certain slaves in favor of the purchaser of the life estate until the determination of that estate; "nor," said the court, "does the lapse of time furnish any presumption against their right to recover their respective interests in the subject," for until the death of the life-tenant they had no cause of action to recover the same. See also *Hope* v. *N. & W. R. R. Co.*, 79 Va. 283.

Moreover, it appears that the appellee, Robert Hall, is, and for many years has been, a non-resident of the State, and how, under all these circumstances, he can be held concluded by his mere silence, when it was not his duty to speak, we are unable to see. In short, without further discussion, we are of

opinion that the construction of the will by the circuit court was plainly right.

This brings us to the consideration of the next and principal question in the case; and that is, whether the claim of the defendants, the appellants here, to compensation for improvements, was rightly rejected.

It appears that after the testator's death, so much of the land as lay within the limits of the town of Harrisonburg was cut up into town lots, and much of it by intermediate conveyances is now owned by the appellants. Upon many of these lots dwellings have been built, and other permanent and beneficial improvements have been made, some prior to the war and the partial destruction of the public records of the county, and others since the war; and the appellants insist that the circuit court erred in refusing to allow compensation for these improvements.

We are of opinion that the decree is right. It is difficult to see how any other conclusion can be reached consistently with the registry laws of the State, and the established principles which apply to a case like the present.

It is a general rule of the common law, subject to some exceptions, as in the case of fixtures, that every thing annexed to the freehold becomes a part thereof, and passes with the recovery. Improvements are therefore made at the occupant's peril, except that in an action against him by the rightful owner for *mesne* profits; the rule has been so far modified, independent of statutes, as that the former is permitted to set off against the plaintiff's claim the value of his improvements, but not in any case to exceed the amount of the rents and profits. 2 Kent's Com. 334; *Jackson* v. *Loomis*, 4 Cow., 168; *Græme* v. *Cullen*, 23 Gratt. 266; *Parsons* v. *Moses*, 16 Iowa, 440.

A different and more liberal rule, however, borrowed from the civil law, prevails in equity. By that rule the rights of the

parties are determined on the equitable principles that, he who seeks equity, must do equity, and that one shall not be permitted unjustly to enrich himself at the expense of another. But to entitle a party in equity to an allowance for improvements, he must have been a *bona fide* possessor under a defective title, supposed by him to be good; or, as defined in *Green* v. *Biddle*, 8 Wheat. 1: a *bona fide* possessor is one, "who not only supposes himself to be the true proprietor of the land, but who is ignorant that his title is contested by any other person claiming a better right to it." And this is so, because the claim for improvements, independent of statutes, is founded upon equitable grounds, and it would be manifestly inequitable to compel the true owner to pay for improvements which were not directed, nor, perhaps, desired by him, and which were made by the occupant with knowledge of the former's claim.

In *Walker* v. *Quigg*, 6 Watts, 87, it was held that one who takes a title, when he knows, or ought to know, that it is defective, is not entitled to compensation for improvements as against the true owner, even though the latter saw the improvements in progress and did not object. If a contrary principle, said the court, were "tolerated or sanctioned, owners of lands might be in danger of being improved out of their titles and rights to them; * * and this in a case where the purchaser had notice of the real owner's rights, would be monstrous." See also, *McKim* v. *Moody*, 1 Rand. 58; *Woodhull* v. *Rosenthol*, 61 N. Y., 382; *Wood* v. *Wood*, 82 Id., 575; *Dart* v. *Hercules*, 57 Ill., 446; *Davidson* v. *Barclay*, 63 Penn. St., 406; *Cook* v. *Kraft*, 3 Lans. 512.

The question was incidentally discussed, and the same view expressed, in *Græme* v. *Cullen*, 23 Gratt. 266, though the improvements for which compensation was sought in that case were made, not by the occupant of the land, but by a firm of builders, under a contract with the owner, who had previously executed a deed of trust thereon, which was duly recorded.

And it seems never to have been decided until a comparatively recent period, that one who has made beneficial improvements on land, even though a *bona fide* possessor, is entitled to be reimbursed for his expenditures, unless brought into equity as *a defendant* at the suit of the owner praying an account of rents and profits or other equitable relief, in which case the principle is applied that he who seeks equity must himself be willing to do what is equitable; or, where the owner by fraud, acquiescence or *laches* has precluded himself from questioning the occupant's claim for improvements; in which cases compensation is allowed the latter, as in cases of partition between tenants in common where one has made improvements for which, *ex equo et bono*, he ought to be compensated.  2 Story's Eq., sec. 799, *a*, 799, *b*; *Id.* sec. 1237, 1238; *Wood's Ex'or* v. *Krebbs*, 33 Gratt. 685.

This principle was recognized in *Walker* v. *Beauchler*, 27 Gratt. 511, 528, where the defendant's claim for improvements was allowed, on the ground that by his acquiescence and *laches* the plaintiff was estopped from contesting it.  And to the same effect is *Southall* v. *McKeand*, 1 Wash. 336; see also 3 Pom. Eq., sec. 1241, *note.*

In *Putnam* v. *Ritchie*, 6 Paige, 390, the plaintiff, in the honest belief that his title was good, improved the estate, and was afterwards sued in ejectment for the recovery thereof.  Thereupon he filed his bill to restrain the further prosecution of the action, or to be allowed for his improvements; but Chancellor Walworth dismissed the bill, saying he could find no case in this country or in England "wherein a court of chancery has assumed to give relief to a *complainant* who has made improvements upon land, the legal title to which was in the defendant, where there has been neither fraud nor acquiescence on the part of the latter after he had knowledge of his legal rights," and that to grant the prayer of the bill would be "to introduce

a new principle into the law of the court," which he did not feel authorized to do.

This decision is in harmony with the doctrine laid down by Judge Story, in his work on Equity, *supra.* But the question some years afterwards arose, and was differently decided, in *Bright* v. *Boyd,* 1 Story's Rep. 478. There relief was granted the complainant, against whom a judgment in ejectment had been recovered for the possession of certain land, which he had previously purchased at a judicial sale, and upon which he had put expensive improvements, supposing his title to be good. Judge Story, at the final hearing, thus stated the principle upon which he based his decision : " I wish, in coming to this conclusion, to be distinctly understood as affirming and maintaining the broad doctrine as a doctrine of equity, that so far as an innocent purchaser for a valuable consideration, *without notice of any infirmity in his title,* has, by his improvements and meliorations, added to the permanent value of the estate, he is entitled to a full remuneration, and that such increase of value is a lien and charge on the estate, which the absolute owner is bound to discharge before he is restored to his original rights in the land. This is the clear result of the Roman law, and it has the most persuasive equity, and, I may add, common sense and common justice for its foundation. S. C., 2 Story, 605.

To the same effect are the following cases: *Thomas* v. *Thomas' Ex'or,* 16 B. Mon., 420; *Valle's Heirs* v. *Fleming's Heirs,* 29 Mo., 152; *Union Hall Association* v. *Morrison,* 39 Md., 281; *Hatcher* v. *Briggs,* 6 Oregon, 31.

Assuming that these adjudications correctly propound the law, the doctrine they announce is not in conflict with the decree appealed from. The appellants were defendants in the court below, and the question is, were they "*bona fide* possessors?" It is not sufficient to say that by their improve-

ments the property has been enhanced in value. The appellees cannot be charged with any part of the cost of those improvements, if the same were made by the appellants, or those under whom they claim, with notice of the appellees' claim; or, in other words, with notice of the infirmity in their own titles. And how can they be held to have been without notice, when, as we have seen, the will of James Hall was duly recorded, and although destroyed during the war, after many of the improvements for which compensation is claimed had been made, it was again recorded after the close of the war, and thus gave notice to the world of the rights of the appellees. Moreover, the deed of April 6th. 1850, from Liggett to M. H. Effinger, through whom the appellants, or the most of them, derive title, refers in terms to the will, and thus put the parties upon inquiry when their respective titles were acquired. And "no principle is better established than that a purchaser must look to every part of the title which is essential to its validity." *Brush* v. *Ware*, 15 Pet. 93.

In *Morris* v. *Terrell*, 2 Rand. 6, it was said by the court that "a man who purchases an estate subject to an equity, which the title papers disclose, is bound in the same way as if he had actual notice, although he may never have seen the title papers, and may have been assured by the vendor, and believed that the estate was free from encumbrance. It is folly or wilful neglect not to have resorted to the means palpably in his power of ascertaining the true state of the title to the property for which he had treated."

In *Burwell* v. *Fauber*, 21 Gratt. 446, it was held that a purchaser "is bound not only by actual but also by *constructive* notice, which is the same in effect as actual notice," and that "he has no right to shut his eyes or his ears to the inlet of information, and then say he is a *bona fide* purchaser without notice."

The language of Mr. Justice Strong, in *Cordova* v. *Hood*, 17 Wall. 1, so often quoted with approbation by this court, is peculiarly appropriate to the present case. He said: "whenever inquiry is a duty, the party bound to make it is affected with knowledge of all which he would have discovered had he performed the duty. Means of knowledge, with the duty of using them, are, in equity, equivalent to knowledge itself." See also *Long* v. *Weller*, 29 Gratt. 347; *Wood* v. *Krebbs*, 30 Id., 708; *Coles* v. *Withers*, 33 Id., 186; *Lamar's Ex'or* v. *Hale*, 79 Va., 147; *Hum* v. *Keller*, Id., 415; *Wood* v. *Carpenter*, 101 U. S., 135.

A strong case on the question of constructive notice is *Armentrout's Ex'ors* v. *Gibbons*, 30 Gratt. 632. There a deed reserving a vendor's lien was duly recorded, and afterwards the record of the deed was destroyed. It was held that the constructive notice afforded by the recordation of the deed was equivalent to actual notice of the existence of the lien, notwithstanding the destruction of the records.

It is contended, however, that in a case like the present, constructive notice of an adverse title is not sufficient; and decisions from other States are cited in support of this view. But an examination of those cases will show either that they are based on statutes, commonly called the "betterment acts," of those States, of which *Whitney* v. *Richardson*, 31 Vt., is an example, or that they relate to purchases at judicial sales, where the title acquired by the purchaser afterwards turns out to be bad by reason of some error or defect in the proceedings; the cases of *Bright* v. *Boyd* and *Hatcher* v. *Briggs*, *supra*, being examples of the latter class. These decisions are, therefore, not in point, for it may be conceded that in cases of this description a distinction exists between the case of an innocent purchaser at a judicial sale, who may well presume that all the proceedings in the cause have been rightly conducted, and

a purchaser *in pais* who negligently fails to examine his chain of title which by the registry acts is required to be recorded.

These remarks, however, must be understood as applying strictly to the case before us. The case is not affected by the provisions of our own statutes in relation to the action of ejectment and to the "allowance for improvements" (Code 1873, chapters 131, 132), which give to an occupant the benefit of his permanent improvements made "while holding the premises under a title believed by him * * to be good," or made "at a time when there was reason to believe the title good," and we are not, therefore, called upon to construe those statutes; for, as was said in *Græme* v. *Cullen, supra,* they are in terms confined to cases in which a decree or judgment is rendered against any defendant for the recovery of land, which is not the present case. For here, according to the doctrine of equitable conversion, the will having directed the land to be sold at the death of the life-tenant, the appellees, and the other legatees having similar interests, never had an estate in the land itself, but only an interest in the execution of the trust. In other words, their interests are considered in equity as personalty and not as realty, and are treated accordingly. *Craig* v. *Leslie,* 3 Wheat. 563; *Tazewell* v. *Smith's Adm'r,* 1 Rand. 313; *Pratt* v. *Taliaferro,* 3 Leigh, 419; *McClanachan* v. *Siter, Price & Co.,* 2 Gratt. 280; *Ropp* v. *Minor,* 33 Gratt. 97; 1 L. C. in Eq. Pt. II, 1159, *et seq.*

This question was very fully discussed in *Harcum* v. *Hudnall,* 14 Gratt. 369, and it was there held that where land is devised to be sold, and the proceeds distributed, the land, as respects the legatees, is deemed in equity *a mere chose in action.* And it was further held that although the legatees may elect to take the land as such, yet that the election can be made only by all the parties in interest uniting therein.

In the present case, no such election has been made, and the

bill was filed, not for the recovery of land, but for a construction
of the will and a sale of the land, with a view to the distri-
bution of the proceeds. No account of rents and profits is
asked for in the bill, nor is any equity sought as against the
defendants. The court is simply asked to construe the will,
and to order a sale. The sale itself is a mere incident of the
proceedings; nor was it necessary to invoke the aid of the
court to effect a sale, since the will imperatively directs the
executor to sell the land at the death of the life-tenant, and
empowers him to make conveyances to the purchaser or pur-
chasers. Manifestly, then, the maxim invoked by the appel-
lants, and upon which they chiefly rely, that " he who seeks
equity must do equity," has no application to this controversy.
It is not enough to say that the appellants, or those under
whom they claim, having expénded their money in making
improvements, ought to be reimbursed. For their rights must
be determined upon fixed principles, and not by any arbitrary
determination of the court as to what is "equity" in the present
case. 1 Story's Eq., sections 19, 20.

We do not mean, however, to be understood as saying that
where land is devised to be sold, and the proceeds distributed
after the determination of a life estate, an occupant who makes
permanent improvements thereon during the existence of the
life estate, honestly believing his title to be absolute, and with-
out the means of knowing the contrary, would not be entitled in
equity to be reimbursed for his expenditures; or that where
land is thus devised, the remainder-man, or legatee to whom
the proceeds are bequeathed, might not by his fraud, acqui-
escence, or *laches*, be estopped from contesting the occupant's
claim to be reimbursed for his improvements. In such cases,
a court of equity, regarding substance, and discarding
technicalities, would doubtless not permit the former "unjustly
to enrich himself at the expense of" the latter, and would so

decree as to do justice between the parties. But no such circumstances exist in the present case, and consequently no such question is presented for determination.

These considerations dispose of the appellants' pretensions, which are sought to be sustained on the principles applicable to cases of partition between tenants in common. It is difficult to see how the relation of tenants in common can be held to exist between the appellees and the life-tenant, or those claiming under her. For her interest was in *land,* whereas, as we have seen, the interest of the appellees was never in land, but in personalty; and the improvements were made in her lifetime, and by those who, representing as purchasers her interest, necessarily stood in her shoes. And it matters not that the improvements were made by persons who were also purchasers of the interests of certain of the remaindermen or legatees. The improvements were made before the time had arrived for a conversion of the land, and *quoad* the land there could be no tenancy in common.

It is a general rule that improvements made by a life-tenant constitute no charge upon the land when it passes to the reversioner or remainder-man, and this rule applies with peculiar force to a case like the present. 1 Washb. on Real Property, marg. p. 95; Sedwick & Wait on Trial of Title to Land, sec. 708.

It is not pretended, or at all events there is no evidence to show, that the appellees have been guilty of fraud, or that by their conduct they have misled the appellants, or in any way influenced their action. It appears that for many years they have been non-residents of the State, and that during much of that time some of them have been under the disability of coverture, and others of infancy. They have undoubtedly used due diligence in asserting their rights, and the decree must be affirmed.

DECREE AFFIRMED.