## Richmond.

TAIT'S EX'OR v. CENTRAL LUNATIC ASYLUM.

January 12th, 1888.

1. EMINENT DOMAIN—*Its exercise.*—The necessity for condemning private property for public uses is not a subject of judicial cognizance, but lies within the province of the legislature.

2. CONSTITUTIONAL LAW—*Contracts with State—Impairing obligations.*—Every contract made with the State is in subordination to its right of eminent domain. And where State leased land for term of years for an insane asylum, agreeing to surrender possession at end of term, and during term, in pursuance of an act of the legislature, instituted proceedings to acquire title by condemnation, *held,* the act was not in violation of the constitution of the United States as impair the obligation of contracts.

3. IDEM—*Compensation—Damage to residue.*—Statute directing commissioners to ascertain the fair rental value of land proposed to be taken, by implication authorizes them to consider the damage to the part not taken, and is not inconsistent with the United States constitution and the Virginia statutes, (chapter 56, Code 1873), which provide for damages to the residue in such cases.

4. DEEDS—*Construction—Parol evidence.*—State leased land for term of years, and by the deed of lease agreed at end of term to surrender the building then, or thereafter to be, erected on it. These terms being unambiguous and no fraud or mistake being alleged, parol evidence is inadmissible to vary or contradict them.

Error to judgment of circuit court of Henrico county, rendered July 1st, 1879, and April 13th and 15th, 1885, respectively, in a certain proceeding wherein the Central Lunatic Asylum is plaintiff, and Charles W. Purcell, executor of Bacon Tait, deceased, and Isaac Davenport, Jr., assignee of Bacon

Tait, and Thomas Moore and Constance R., his wife, the heirs at law of decedent, are defendants.

This was a proceeding in the said court to condemn certain real estate for the use of the Central Lunatic Asylum. The land sought to be condemned was a part of the estate of Bacon Tait, deceased.

The following facts are disclosed by the record: The said Tait in his lifetime was the owner of a certain tract of land, lying on the south side of the Mechanicsville turnpike, in the suburbs of Richmond. During the late war, the Confederate government took possession of fifteen acres of this land, and established a military camp and hospital thereon, which at the close of the war, was turned over by the Federal authorities to a military bureau, known as the "Bureau of Refugees, Freedmen, and Abandoned Lands." Afterwards, to-wit, on the first day of November, 1868, Tait leased the said fifteen acres of land to one George Q. White, an officer of the United States army, acting for and on behalf of the said bureau, for a stipulated sum, payable in monthly instalments. The deed of lease, a copy of which is contained in the record, stipulates, among other things, "that whenever either party shall desire the tenancy to cease, the party so desiring shall give thirty days' notice to the other party, and that the party of the second part shall have, at any time during the said thirty days, or at any time previous, full power and privilege to sell or in any way dispose of the buildings now standing on said land, or that may hereafter be erected by the United States government, provided that all rents due for said land are paid."

The tenancy was terminated by an order of the military commandant, stationed at Richmond, on the 17th of December, 1869, whereby it was directed that the use of the buildings be "turned over to the State of Virginia, for the purpose of establishing a temporary lunatic asylum." It appears, however, that on the 1st of January, 1870, Tait formally by deed, leased to the State for ten years the premises embraced in the

above-mentioned lease upon certain stipulated terms, the property being described as "all those certain lots of land, bounded, &c., upon which the buildings known as the 'Howard's Grove Hospital' are situated," &c.   The deed also contains the following clause: "The said lessee covenants to pay the rent in the manner above stated, and that at the expiration of the said term, to-wit, on the 31st day of December, 1879, without any notice so to do, the State of Virginia will deliver to the lessor, his agents, or assigns, quiet and peaceable possession of *the said property*.   And it is furthermore agreed that if any taxes should be assessed on the buildings or other improvements on the said demised premises, they shall be paid by the lessee."

It appears that a number of buildings were erected upon the premises by the Federal authorities, during the tenancy first above mentioned, and that additional buildings were erected thereon after the making of the lease to the State—all of which were upon the premises when this proceeding was instituted.

The Central Lunatic Asylum was established by an act of Assembly, approved June 7, 1870.   The preamble to the act refers to the premises and buildings above mentioned, in these words: "Whereas it appears to the General Assembly that there now exist at Howard's Grove, near the city of Richmond, several lots of land with suitable buildings thereon for the reception and care of persons of unsound mind, to *the use* of which the State of Virginia is entitled for the term of ten years next ensuing, from the 1st day of January, 1870, under a lease made and entered into with Bacon Tait, *the owner* thereof," etc.   And then the act provides for the appointment of a board of directors to temporarily locate a lunatic asylum at Howard's Grove, and to manage the same, etc.   Acts 1869–70, p. 189.

After the passage of this act other buildings were erected upon the premises by the State at various times, which have never been removed, or at least had not been removed at the time of the commencement of this proceeding.

By an act, approved February 8, 1879, entitled: "An act to authorize the condemnation of the use of the land now occupied by the Central Lunatic Asylum," it was enacted that if the president and directors of the asylum could not agree on the terms of a lease of the land occupied by the asylum under the said lease with Tait for five years, to commence upon the termination of that lease, with those entitled to the land, then that five disinterested freeholders should be appointed commissioners by the circuit court of Henrico county, in which county the land is situate, for the purpose of ascertaining a just compensation, to be paid annually, semi-annually, quarterly, or monthly, for the use of the land for the term aforesaid. And by the fifth section it is enacted that "the commissioners, after viewing the lands, buildings, and so forth, and hearing such proper evidence as either party may offer, shall ascertain what will be a just compensation—first, for the use of said land only for the term aforesaid; second, for the use of said land and the buildings and other improvements thereon [which were there on the first day of January, 1870,]; and third, for the use of the term aforesaid of the said land and the buildings and other improvements thereon [which were there on the 27th day of March, 1874,]; but in ascertaining what will be a just compensation in each case mentioned, the said commissioners shall only ascertain what will be a fair rental value for the property actually taken, and shall make report," etc. Acts 1878–79, p. 73.

It appears from the record that on the 27th of March, 1874, C. W. Purcell, executor of Bacon Tait, deceased, addressed a letter to the board of directors of the asylum, giving permission to the board on the part of himself and the legatees, to remove any buildings or improvements that it might put upon the premises after that date, and saying further that if the State desired to purchase the improvements already there, he would be pleased to receive and make a proposition to attain that end.

After the passage of the act last above mentioned, the circuit court of Henrico county appointed commissioners, pursuant to the act, who having acted, reported that for the use of the land only, upon which the asylum was located, four hundred and sixty dollars *per annum* would be a just compensation; that for the use of the land and the improvements which were thereon on the first day of January, 1870, six hundred and fifty dollars *per annum* would be a just compensation; and that for the use of the land and the improvements which were thereon on the twenty-seventh day of March, 1874, nine hundred and forty-five dollars *per annum* would be a just compensation for a term of five years.

To this report the defendants, the executor and legatees of Bacon Tait, deceased, excepted on various grounds. Testimony was taken on the part of the asylum, the plaintiff in the proceeding in the circuit court, to show that when the lease from Tait to the State was made, on the first day of January, 1870, the understanding between the parties was, that the State was to have the privilege of removing all improvements which it might put upon the demised premises during the term. The defendants objected to this testimony, on the ground that parol contemporaneous evidence was inadmissible to contradict or vary the terms of the deed, but the objection was not sustained. And the cause coming on to be heard, the circuit court held that the State was entitled to *all* the buildings and improvements upon the premises, with the right to remove the same, and accordingly ascertained the compensation to be paid to the owners of the land to be at the rate of four hundred and sixty dollars *per annum* for the use of the land for a term of five years, commencing on the first day of January, 1880.

To this order a writ of error was awarded by this court.

*R. T. Hubard* and *Johnston, Williams* & *Boulware,* for the plaintiff in error.

*Meade Haskins*, for the defendant in error.

LEWIS, P., after stating the case, delivered the opinion of
the court.

Taking up the assignments of error in the order in which
they are presented, the first is, that the statute under which
the proceeding was instituted and conducted in the lower
court, is unconstitutional.   This contention is based upon
three grounds.   The first is, that private property for public
use can be constitutionally taken only when there is a necessity
for such taking, and that no such necessity exists in the present
case.   The answer, however, to this position is, that the prop-
erty sought to be condemned being intended for a public use,
the necessity for its appropriation is not a subject of judicial
cognizance, but belongs exclusively to the legislature.   *Roan-
oke City* v. *Berkowitz*, 80 Va., 616.   And the second ground
upon which the objection is based is equally untenable, namely,
that the statute is repugnant to the contract clause of the federal
constitution, because it impairs the obligation of the covenant on
the part of the State, contained in the deed of lease of the 1st
of January, 1870, which bound the State to deliver to the les-
sor, his agents, or assigns, possession of the demised premises
at the expiration of the term, to-wit, on the 31st of December,
1879.

This view overlooks or ignores the existence of the right of
eminent domain, which the State possesses, and which is inhe-
rent in every sovereignty.   Indeed, the power is essential not
only to the public safety and convenience, but to the existence
of government, and cannot be surrendered by the agents of
the State.   All the property in the State is, therefore held sub-
ject to this power, the exercise of which is subject only to the
limitation that just compensation must be made in all cases for
the property taken.   And we perceive no distinction in princi-
ple between a case like the present, where the State is already in

possession of the property, as lessee, under a contract with the lessor to deliver possession at a certain time, and an ordinary case of condemnation, where no such relations growing out of contract exist; for in the former case the State, in entering into the contract, acts merely as an individual may do, whereas in condemning the property, it acts in its sovereign capacity. In other words, a right founded upon a contract with the State is not more sacred than any other property.

In his work on Constitutional Limitations, Judge Cooley, in treating of this subject, well says: "When the existence of a particular power in the government is recognized on the ground of necessity, no delegation of the legislative power by the people can be held to vest authority in the department which holds it in trust, to bargain away such power, or to so tie up the hands of the government as to preclude its repeated exercise, as often and under such circumstances as the needs of the government may require." Chap. 15, p. 525. And the same view has been frequently taken by the courts of the several States and by the supreme court of the United States. Thus, in the leading case of *West River Bridge Co.* v. *Dix*, 6 How., 507, the court said: "The power denominated the eminent domain of the State is, as its name imports, paramount to all private rights vested under the government, and these last are, by necessary implication, held in subordination to this power, and must yeild in every instance to its proper exercise. The constitution of the United States can, by no rational interpretation, be brought to conflict with this attribute in the States. There is no express delegation of it by the constitution, and it would imply an incredible fatuity in the States to ascribe to them the intention to relinquish it." And in the same case it was also said that every contract is made in subordination to certain conditions, of which the right of eminent domain is one. See also *Boom Co.* v. *Patterson*, 98 U. S., 403; *United States* v. *Jones*, 109 *Id.*, 513; 3 Pars. Cont., 537 *et seq.*, and cases cited.

The third ground of objection to the validity of the statute is, that it does not make proper provision for ascertaining a just compensation to the owners for the use of the property in question.    The statute provides that the commissioners, to be appointed by the court, after viewing the premises and hearing such evidence as either party may offer," shall only ascertain what will be a fair rental value for the property actually taken, and shall make report," etc.    The defendants contend that the establishment and maintenance of a lunatic asylum on the land, injuriously affects the value of the residue of the tract, and, therefore, that the commissioners ought to have been directed to consider "the damages to the residue of the tract" occasioned by the proximity of the asylum for the use of which the land was wanted.

Such a provision is contained in the general statute relating to the condemnation of property, as it stands in chapter 56 of the Code of 1873; but we do not think the effect of the omission of a similar provision in the statute under consideration, was to prohibit, or that such omission was intended to prohibit, the commissioners from taking into consideration all the circumstances necessary to be considered in order to ascertain the "*fair* rental value" of the land proposed to be taken.    In no other way could such a result be arrived at, and by plain implication, therefore, the commissioners were authorized to consider all such circumstances in discharging their duties under the act.    But be that as it may, there is no evidence to show that the defendants have been prejudiced by the report of the commissioners, and nothing more upon that point need be said.

We are of opinion, however, that the circuit court erred in holding that the State was entitled to all the buildings on the premises, and in proceeding accordingly.    The deed of lease of the first of January, 1870, by which the rights of the parties in this particular are to be determined, is plain and unambiguous in its terms, and neither fraud nor mistake in respect

thereof is alleged. Hence, its language or legal import cannot be altered or modified by evidence of any previous or contemporaneous parol agreement respecting the removal of the buildings on the premises at the date of the deed, or thereafter to be erected thereon during the tenancy, and the depositions considered by the circuit court ought, therefore, to have been excluded. 1 Greenl. Ev., sec's 275, 277. In *Woodward* v. *Foster*, 18 Gratt., 200, Judge Joynes, after referring to the rule of the common law on this subject, said: "These general principles are of the utmost importance in the administration of justice. Without them, there would be no certainty in written contracts, and no safety in the most formal transactions. They ought not to be frittered away by nice distinctions to meet the hardships, real or supposed of particular cases." Accordingly, it was held in that case that the legal import of the defendant's endorsement of certain negotiable instruments, could not be varied by evidence of a contemporaneous parol agreement.

And in a recent case in the supreme court of the United States, the rule, and the reason upon which it is founded, is stated in these words: "No principle of evidence is better settled at the common law, than when persons put their contracts in writing, it is, in the absence of fraud, accident, or mistake, conclusively presumed that *the whole* engagement, and the extent and manner of their undertaking, was reduced to writing. * * Where parties have deliberately put their engagements in writing, and no ambiguity arises out of the terms employed, you shall not add to, contradict, or vary the language mutually chosen as most fit to express the intention of their minds. What if parol evidence prove, never so clearly, that they used such and such words in making their bargain, the writing signed, if it contain not those words, is final and conclusive evidence that they were set aside in favor of the other expressions that *are* found in the written instrument. And hence this rule of law is only a conclusion of reason, that that medium of proof is most trustworthy which

is most precise, deliberate, and unchangeable." *Bast* v. *Bank,* 101 U. S., 93. See also *Crawford* v. *Jarrett,* 2 Leigh, 630; *Watson* v. *Hurt,* 6 Gratt., 633; *Towner* v. *Lucas,* 13 Id., 705; *Colhoun* v. *Wilson,* 27 Id., 639; *Barnett* v. *Barnett,* 83 Va., 504.

The record shows that on the 27th of March, 1874, permission in writing was given by the executor of Tait and the legatees to the asylum authorities to remove such improvements as they might thereafter put upon the premises, and no claim is made by the defendants to any of the improvements which were made after that date. But to all the improvements on the premises at that time, they do claim to be entitled as a part of the freehold, and their claim is well founded. *Effinger* v. *Hall,* 81 Va., 94. The terms of the lease, as we have said, are unambiguous. There is nothing doubtful about it; its legal import is unquestionable. Any doubt as to "the extent and manner" of the contract arises not from reading the deed, but the evidence as to the alleged contemporaneous parol agreement. Nor can we look to the deed of lease from Tait to the agent of the Freedman's Bureau, because that is a wholly different transaction, between different parties, and having no connection whatever with the deed under consideration. And even if this were not so, the result would be the same, for no right was given the lessee, by the terms of that deed, to remove or dispose of the buildings on the premises after the end of the term.

Indeed, the legislature itself, in the act of June 7, 1870, establishing the Central Lunatic Asylum, recognized that the State was entitled only to the use of the buildings then on the premises, as lessee, and that the title was in Tait. Acts 1869–70, p. 189. And by a subsequent act, passed at the session of 1873–74, appropriating money for the purpose of erecting a ward in the asylum, it was expressly provided that no portion of the money should be expended on the buildings then existing, and providing further that the right to sell or remove the buildings to be erected under the provisions of the act, should

be obtained from the lessor by the board of directors.  And in a number of the annual reports of the superintendent of the asylum, which by consent are made a part of the record in this case, the same construction was put upon the lease.  Nor does the provision in the lease, binding the State to pay the taxes on the buildings, if any should be assessed thereon during the term, militate against this view.  As the buildings were occupied by the State, it may have been supposed that no taxes would be assessed upon them.  At all events, the provision does not give the lessee the right to remove the buildings, nor, we repeat, does it occasion any ambiguity to be explained by parol evidence.  If, then, the deed does not express the true agreement between the parties, it was the folly of the State's agent to have signed it.

The circuit court ought, therefore, to have adopted, as the basis of its order, that part of the commissioner's report which ascertains the sum of nine hundred and forty-five dollars *per annum* as a just compensation for the use of the land and the buildings which were thereon on the 27th day of March, 1874, instead of entering the order complained of.  And for this error, the order will be reversed, and the case remanded for further proceedings in conformity with this opinion.

DECREE REVERSED.