LENNIG'S EX'RS

*v.*

WHITE.

*(Supreme Court of Appeals of Virginia, Dec. 22, 1894.)*

[20 S. E. Rep. 831.]

**Adverse Possession—Tax Sale—Case at Bar.**

In 1796 the commonwealth of Virginia granted by patent 93,000 acres of land to B., who never took possession of the same or paid any taxes thereon. In 1806 the United States marshal sold and deeded the tract to G. at a tax sale, for direct taxes due the United States, which deed was duly recorded. B. lived for nine years after this sale, but never questioned it. The tract was mostly wild mountain land, and after said sale, in 1806, parts of the tract were sold, devised, leased, and improved in many ways, all parties tracing their rights to the tax sale above. The various owners subsequent to G., and all claiming through him, successfully asserted their title in several legal proceedings; and the tract was known throughout the country as the "Waterman Tract," that being the name of the last owner under G.'s title. B.'s title was also forfeited for nonpayment of state taxes: *held*, in a suit by heirs of B. against those claiming under G. as above, that defendants were entitled to the land by adverse possession.

**Same—Description of Land by Metes and Bounds.**

A description by metes and bounds is not necessary, where the premises are well known by name.

**Same—What Constitutes—Case at Bar.**

An adversary possession must be actual; that is, by occupation, use, or enjoyment, or other notorious and habitual acts of ownership. Cultivation and improvement are not the only tests of adversary possession. Habitually cutting and selling wood by a claimant of a tract of land in vicinity of a city, or, in case of an uninclosed city lot, where the owner uses it as a coal or lumber yard, quarry, or landing place, are all instances of possession regarded by the law as sufficient upon which to base title by prescriptive use.

**Nonpayment of Taxes—Forfeiture Statutes—Constitutionality of.**

Statutes forfeiting land for nonpayment of taxes are constitutional, and, in order to consummate a forfeiture in such a case, no judgment or decree or other matter of record is necessary; the statute *a proprio vigore* effectually divests title out of the defaulting owner, and perfectly vests it in the commonwealth.

**Purchasers—Notice—Duty of Inquiry.**

Wherever inquiry is a duty to one purchasing property, the party bound to make it is affected with knowledge of all that he would have discovered had he performed his duty. Means of knowledge, with the duty of using them, are in equity equivalent to knowledge itself.

**Tax Sale—Acquiescence—Presumption of Validity.**

Where property was sold for taxes 80 years ago, during which time the former owners have acquiesced in the sale, and in the possession of the purchaser and his grantees, and where the records of the court in which the proceedings were had have been largely destroyed by fire and war, the sale will be presumed to be valid.

**Tax Deed—Valid on Face—Effect.**

A tax deed valid on its face will give color of title, though it may be defective in form or substance, or be founded on irregular proceedings.

Appeal from circuit court, Rockingham county.

Bill by John K. White against Clement B. Barclay, Charles Lennig, and others for partition and other relief. Said Lennig having died, the cause was revived against Nicholas Lennig and John B. Lennig, his executors. From a decree for complainant, said executors appeal. Reversed.

*Conrad & Conrad, G. Eastham,* and *Holmes Conrad,* for appellants.

*John E. Roller,* for appellee.

RICHARDSON, J., delivered the opinion of the court.

This is an appeal from a decree of the circuit court of Rockingham county rendered on the 31st of October, 1892, in the suit in equity therein then pending wherein John K.

White was plaintiff and Clement B. Barclay and others were defendants.   The object of the suit was to have partition, under the provisions of section 2562 of the Virginia Code of 1887, of a tract of 93,000 acres of land lying in the counties of Rockingham and Pendleton, the latter county now being in the state of West Virginia, but formerly in Virginia, which tract of land was granted by the commonwealth of Virginia, in the year 1796, to John Barclay, a citizen of the city of Philadelphia and state of Pennsylvania.   The substantial facts appearing by the record are these:   On the 5th day of March, 1796, there was granted by the commonwealth of Virginia to John Barclay, in his own right for one moiety, and as assignee of Matthew Gambill for the other moiety, a tract of 93,000 acres of land, lying partly in the county of Rockingham, in the state of Virginia, and partly in the county of Pendleton, now in the state of West Virginia, but formerly also in the state of Virginia.   The tract of land thus granted to John Barclay in 1796 was in the year 1806 sold by Joseph Scott, marshal for the district of Virginia, in the name and as the property of John Berkeley, as delinquent for the nonpayment of the United States direct land tax due thereon ; and at said sale H. J. Gambill became the purchaser of said tract of land ; and by deed dated the 1st day of June, 1806, said marshal conveyed the said tract of land to said Gambill, the deed reciting the authority under which said sale and conveyance was made ; and said deed was recorded in December, 1806.   Thereafter the said tract of land was conveyed by the successive deeds now to be referred to :  By deed from H. J. Gambill and wife to Asher Waterman, dated December 16, 1806, and recorded December 16, 1806 ; by deed from Asher Waterman's heirs to Augustus Waterman, dated June 8, 1827, and recorded June 8, 1827 ; by deed from Augustus Waterman's devisees to the appellants' testator, Charles Lennig, dated July 9, 1859, and recorded July 9, 1859.   All these conveyances are set forth in

the plaintiff's bill, with the simple comment that all of them
"are deeds of special warranty only" ; a circumstance of
no significance whatever touching the real merits of this
controversy.    The bill sets out at great length the genealog-
ical history of the Barclay family, and alleges that by deed
bearing date the 8th day of May, 1890, from De Grasse
Fox and Harriet Biddle, his wife, who is a remote descendant
of said grantee, John Barclay, which deed has been duly
recorded in the clerk's office of the county court of Rock-
ingham county, the complainant is the owner of an undivided
one-ninth interest in said tract of land, and is desirous of
having a partition of same in kind, if such partition can be
had with due regard to the interest of all concerned, and, if
this be not practicable, of having a sale of said land, or at least
that portion of the same that lies in the state of Virginia,
and a distribution of the proceeds.    And the bill further
alleges "that your con plainant finds, however, that by an
agreement dated the 6th day of March, 1890, one Charles
Lennig [the appellants' testator] has undertaken to sell and
convey to the J. P. Houck Tanning Company, a corporation
under the laws of the state of Virginia, upon certain terms
and conditions, all the tan bark to be found in and upon said
tract of land ; and the said company has, through its agents
and employees, entered upon the  same, and is now actively
engaged in cutting down the chestnut trees and other grow-
ing timber upon the  said tract  of land from which said tan
bark can be procured, and, unless restrained by the court, will
utterly destroy said timber, to the irreparable damage of the
freehold."    And a copy of said paper is filed, marked "B,"
as an exhibit with the bill.    The bill further sets forth that
from said agreement it appears that the contract in respect
to the sale of the right to cut and carry away said tan bark
was originally with J. P. Houck and J. C. Steigle, who
assigned their interest in the same to England & Bryan, who
in turn assigned the same to the said J. P. Houck Tanning

Company.    And the bill further sets forth that the said Len-
nig, in said agreement, professes to have acquired said tract
of land from the heirs of Augustus Waterman, deceased,
and, tracing this claim of title, your complainant finds it is
derived through Augustus Waterman and the heirs of Asher
Waterman, deceased, by deeds, with covenants of special
warranty only, from Henry J. Gambill, who bought the
whole of said tract of land, for the sum of $8.09, from
Joseph Scott, marshal, as aforesaid, under a sale made of
the same as the property of John Berkeley (not Barclay),
as delinquent, for the nonpayment of the United States
direct land tax, and received a deed therefor ; and thus
practically admitting a good title in Gambill and those
claiming under him.    But the plaintiff, in his bill, proceeds
to negative this seeming admission, as follows : "That, as
your complainant is informed and believes, these tax sales
and deeds have been held to be illegal and invalid so often
and so uniformly by the court as scarcely to constitute them
sufficiently strong to make even a color of title to any lands
referred to in them.    That, as he avers in this case, the sale
deed aforesaid were had and made, without the formalities
required by law, as the property of John Berkeley (not Bar-
clay), under a law itself unconstitutional and void, the same,
and all deeds made in pursuance of and under said sale and
deed, must be set aside, canceled, and annulled."    In this
way, and only in this way, does the plaintiff in his bill
attempt to assail the title of the appellants' testator.    Then,
after reciting the several deeds of conveyance hereinbefore
referred to, the bill proceeds :    "That in addition to the
claims asserted to said tract of land under said deeds, and
under the agreement aforesaid with the 'J. P. Houck Tanning
Company,' your complainant finds that the corporation
known as the 'Royal Land Company of Virginia' has placed
upon record a deed of trust or mortgage, bearing date the 2d
day of October, 1876, and recorded on the 20th of January,

1877, under which it professes to convey said tract of land, as the owner thereof, to the Fidelity Trust, Insurance and Safe-Deposit Company of Philadelphia, also a corporation, in trust to secure certain bonded debts of said Royal Land Co. He also finds an agreement of record between Charles Lennig and the Potomac and Ohio Railroad Company, a corporation, dated April 20, 1881, and recorded on the 1st day of September, 1882 ; also an agreement between Charles Lennig and R. N. Pool, dated June 27, 1883, and recorded on the 3d day of March, 1885, under which certain interests in the title of said Lennig are conveyed to said Pool ; also a contract between R. N. Pool and James Boyce, dated February 27, 1885, and recorded on the 30th of March, 1885, under which the said R. N. Pool conveyed to the said James Boyce the undivided moiety of his rights under his contract with the said Charles Lennig ; and also a further contract between the said R. N. Pool and Samuel E. Griscom, dated the 1st day of September, 1888, and recorded on the 6th day of January, 1890, under which the said Pool conveyed to said Griscom all interest then owned by him in the Lennig tract, among others. That your complainant also finds that Asher Waterman and Augustus Waterman, while they were alive, made some quit-claim deeds to small portions of said tract ; but by whom these are now owned your complainant is unable to state, and he proposes to bring these claimants before the court by amended bill, if the same be deemed necessary or advisable. Wherefore, being remediless save in equity, where matters of this sort are alone and properly cognizable, your complainant prays that Clement B. Barclay, James Barclay, C. Francis Barclay, Mortimer Barclay, Christian Wallace, Edward Trenchard, Dudley Digg (Smith), and Mary, his wife, formerly Mary Barclay, Clement Philips, and Ann C., his wife, formerly Ann Clifford Biddle, De Grasse Fox, and Harriet B., his wife, formerly Harriet Biddle, Dr. Samuel Miller, and Elizabeth, his wife, formerly

Elizabeth Rebecca Biddle, William O. Biddle and Dr. Clement Biddle, Geo. W. Biddle, Mary L. C. Biddle, widow of Chapman Biddle, dec'd, Charles Lennig, J. P. Houck, Jno. C. Steigle, Thos. Y. England, Edward A. Bryan, and Charles S. Walton, partners in trade under the firm name and style of England & Bryan, the J. P. Houck Tanning Co., a corporation, the Royal Land Co. of Virginia, a corporation, the Fidelity Trust, Insurance and Safe-Deposit Co., a corporation, the Potomac & Ohio Railroad Co., a corporation, R. N. Pool, James Boyce, and Samuel E. Griscom may be made parties defendant, and be required to answer, answer under oath being expressly waived ; that the J. P. Houck Tanning Co., its agents and employees, and all other persons, may be enjoined and restrained from cutting any trees of any sort growing in and upon said tract of land for the purpose of peeling the bark therefrom, or for any other purpose, and from removing any timber of any sort already cut, or any bark already peeled, until further order of the court ; that the court may take cognizance of the various questions presented in this bill affecting the legal title to said tract of land, and that after these are determined there may be a partition of the same, if practicable, and, if not practicable, that there may be a sale of same and a distribution of the proceeds of sale, for general relief,'' etc.

The injunction was granted according to the prayer of the bill.   The J. P. Houck Tanning Company demurred to and answered the bill.   In its answer, to which only a very brief reference is necessary, this respondent says that it contracted with Charles Lennig as set forth in the copy of the agreement filed with complainant's bill, and with the full relief that the said Lennig was the legal and rightful owner of the said land, and had the right to contract with respondent as he did ; that respondent company was conducting an extensive tanning business at Harrisonburg, and had recently arranged, at very heavy cost, to greatly extend and enlarge

its said business ; that to effect this object it had entered into said contract with said Lennig as the surest means of conveniently procuring a sufficient supply of tan bark, and had contracted to pay a more liberal price than he would have been willing to give for bark in smaller quantities ; that it had expended a very large sum of money in enlarging its tannery, and in securing the bark on this land, and that it could not obtain the necessary supply of bark elsewhere, as the season was too far advanced for peeling bark in sufficient quantities. And this respondent avers that the said Charles Lennig has been in the actual possession of this land, under at least color of title, and, as it is informed and believes, under a good title, for many years, certainly for as much as 30 years ; that during all of this time the said Lennig has in every way exercised ownership and control over the land, and and has had continuous, unbroken, open, and notorious possession of the land, and adversary possession as to all claimants whomsoever, and the world at large. "Your respondent further says that, believing that the said Charles Lennig has a complete and perfect title to the said land, and that he was fully authorized to treat and deal with respondent, it entered into the contract above referred to, and proceeds to cut and peel bark, according to the terms and provisions of said contract ; that it has already expended a large amount in cutting, peeling, and curing this bark, and has made contracts for the delivery of the same at its tannery at Harrisonburg, Va. ; that it has already expended as much as $6,000. And respondent says that it does a very large business at Harrisonburg, Va., in tanning six hundred hides per week, and has made arrangements so that the output of its tannery will be 1,200 hides per week. And respondent further says that it relied upon said contract, as being made between parties competent to contract, and relied upon the bark which had been cut from this large tract of land to supply its tannery, and its operations are dependent upon it. And.

respondent therefore prays for a dissolution of the injunction, so as far as it is concerned, or, if the court will not dissolve the injunction, then that a bond be required of sufficient penalty to indemnify and save respondent harmless from loss resulting from said injunction,'' etc. Later, in vacation, and said J. P. Houck Tanning Company moved to dissolve the injunction, which motion was overruled; but the restraining order was so far modified as to permit, under certain specified conditions, the said company to remove from said land the bark already cut and peeled. The defendants J. P. Houck and J. C. Steigle and Thomas Y. England and Edward A. Bryan and Charles S. Walton, partners doing business under the firm name and style of England & Bryan, jointly demurred to and answered the bill; but the matter contained in their answer need not be further referred to, as the same is not necessary to a proper decision of this case.

At the April term, 1891, the death of the defendant Charles Lennig was suggested, and the cause was revived against his executors, the appellants Nicholas Lennig and John B. Lennig. And at the October term, 1891, by leave of court, the executors filed their demurrer to the plaintiff's bill, assigning several specific grounds of demurrer, to which the plaintiff replied generally, and the same was argued by counsel; upon consideration whereof the court overruled the demurrer. And thereupon, on the motion of said executors, leave was given them to file their answer, and the same was then filed, with general replication thereto. In their answer they admit that on the 5th day of March, 1796, there was granted by the commonwealth of Virginia to John Barclay, of the city of Philadelphia, a tract of 93,000 acres of land, situated as set forth in the complainant's bill; they suppose it is true that said Barclay died many years ago, but they say they are not informed whether the persons named in the bill are the heirs of John

Barclay, and in this respect they neither admit nor deny. But they do deny that either the said John Barclay or any of his heirs are entitled to any right, title or interest in the bill mentioned; but, on the contrary, they say that they are the owners of a large portion of the said tract. That it is true that Charles Lennig, respondents' testator, did make the contract with Houck and Steigle by which he sold to them the right to cut and remove bark, etc., and they believe complainant's Exhibit B is a correct copy of that agreement. That they further say that their testator had a perfect right and full power to make said contract and agreement; that he bought said land from W. H. Ruffner and others, devisees of Augustus Waterman, in 1859, and on the third day of July of the same year received a deed therefor, which on that day was duly recorded in the office of the clerk of the county court of Rockingham county; and they file a copy of the said deed with and as a part of their said answer, and also a copy of the will of Augustus Waterman they likewise file. That the said Augustus Waterman derived title to said land through the will of Asher Waterman, his father, and a deed from the heirs of Asher Waterman; they file with and as a part of their answer copies of said will and deed. That the said Asher Waterman derived his title thereunto through H. J. Gambill, by deed of date December 16, 1806, which they also exhibit with and as a part of their answer. And that said Gambill, by deed from J. Scott, marshal of the district of Virginia, of date June 6, 1806, a copy of which deed is also exhibited by them, said land being sold in pursuance of law by said marshal as delinquent for the nonpayment of the United States direct tax assessed thereon by the United States government. And these respondents say that all of the provisions and requirements of the act of congress of the United States under which the land was sold were fully complied with. And, further answering, they say that their

testator and those through whom he claimed have been in undisputed actual possession and ownership of said land for nearly a century under and by virtue of said conveyances, etc. ; that no one has ever questioned the validity of their title until this suit was brought, and there is no just ground for it now ; that for nearly a century they have had open, notorious possession, adverse to the complainant and the rest of the world ; that they have paid all the taxes assessed against the land since 1806, have sold many smaller tracts from the original tract, and put the purchasers in possession ; that deeds of conveyance were duly executed and recorded, and that the purchasers have since their purchases been in undisputed, open, and notorious and continuous adversary possession, under and by virtue of said conveyances, for a great many years, for more than the statutory period ; that they have from time to time had tenants on the land to watch over it, care for it, and prevent depredations, have leased portions of the land, and received rents therefor, and, in fact, in every way exercised such open, notorious acts of ownership and continued adversary possession as the land, from its character and quality, was susceptible of.    Respondents deny that John Barclay or those claiming under him have ever had actual possession of any part of this land now sought to be taken from the estate of their testator.    And the respondents further say that, in addition to the delinquency and nonpayment of the United States direct tax, for which the land was sold by said Scott, marshal of the district of Virginia, the said John Barclay also forfeited his title thereto by his failure to pay the taxes assessed thereon and due to the commonwealth of Virginia, as they will show from the auditor's books of this state, and that the said Barclay, nor any one for him, has ever redeemed the said land after it was so forfeited, so that the chain of title under which the plaintiff claims from the commonwealth is broken and forfeited, and he has no title whatever.    And respond-

ents further say that the land has not been assessed to the said John Barclay or his heirs on the assessor's books of Rockingham county since the year 1806 ; that the complainant and those under whom he claims have not at any time had the land placed upon the land books of either Rockingham or Pendleton counties, and assessed for taxes, and paid the taxes thereon, as required by law to be done by persons claiming to own land which has been dropped from the land books, etc.   The cause came on to be heard at the October term, 1892, when a decree was pronounced declaring that the complainant and others claiming under the original patent to John Barclay, and under the title which has descended to some of them as his heirs at law, and under the devises and conveyances made to others from some others of said heirs at law, are the rightful owners of the tract of 93,000 acres of land in the bill and proceedings mentioned and described.   That they be quieted in their possession and ownership of the same. That the deeds and contracts set forth and referred to in said bill of complaint, to wit, the deed from Joseph Scott, marshal, to Henry J. Gambill, dated the 1st day of June, 1806, and recorded December —, 1806, the deed from H. J. Gambill, and wife to Asher Waterman, dated December 16, 1806, and recorded on the same day ; the deed from Asher Waterman's heirs to Augustus Waterman, dated 28th of June, 1827, and recorded on the same day ; the deed from Augustus Waterman's devisees to Charles Lennig, dated the 9th day of July, 1859, and recorded on the same day ; the agreement between Charles Lennig, the J. P. Houck Tanning Company, Houck & Steigle, and England & Bryan, dated the 6th day of March, 1890, and recorded on the 22d day of March, 1890 ; the agreement between Charles Lennig and Richard N. Poole, dated 27th day of June, 1883, and recorded on the 3d day of March, 1885 ; the deed of trust or mortgage from the Royal Land Company of Virginia to the Fidelity Trust, Insurance & Safe-

Deposit Company of Philadelphia, dated the 2d day of October, 1876, and recorded on the 2d day of January, 1877 ; and the agreement between Charles Lennig and the Potomac & Ohio Railroad Company, dated the 20th day of April, 1881, and recorded on the 1st day of September, 1882 ; the agreement between Richard N. Pool and James Boyce, dated the 27th day of February, 1885, and recorded on the 3d day of March, 1885 ; and the agreement between Richard N. Pool and Samuel C. Griscom, dated 1st day of September, 1888, and recorded on the 6th day of January, 1890,—be canceled, vacated, and annulled in so far as they relate to, or have any connection whatever with, the title to said tract of 93,000 acres of land. And declaring and decreeing certain other things not necessary to be here more particularly referred to. From that decree the case is here on appeal.

Instead of passing seriatim upon the question directly and incidentally presented by the record, we will present our view of the whole case, in order that the correctness of the conclusion arrived at may be more readily apprehended. The 93,000 acres of land in controversy was granted by the commonwealth of Virginia to John Barclay by patent dated the 5th day of March, 1796, and the same was regularly entered on the land books of the state, and the taxes assessed thereon in his name from the year 1797 to the year 1806, inclusive ; not one cent of which has ever been paid by said Barclay or his heirs, or by any other person for him or them. Not only was this land so delinquent and forfeited to the state of Virginia, but it was also delinquent for the nonpayment of the United States direct tax charged thereon in pursuance of certain acts of congress which need not be here enumerated, it being admitted in the plaintiff's bill that the land was so delinquent, and was in 1806 sold by Jos. Scott, United States marshal for the district of Virginia, for the nonpayment of such taxes, and that the same was at such

sale purchased by H. J. Gambill, who received from said marshal a deed therefor, dated and recorded as above stated. John Barclay, the original grantee, a citizen of the city of Philadelphia, died in the year 1815, intestate, leaving numerous descendants, as is shown by the history of the family set out in the plaintiff's bill ; and, although he lived for nine years after the sale of this land by the United States marshal, it is not pretended that he ever in any way evinced the least disposition to question the validity of either the sale or conveyance made by that officer of the law. Nor did he during his life, or his heirs since his death, ever take any steps either to challenge the validity of the sale and conveyance by said marshal, or to redeem the land from the forfeiture to the state. By virtue of the tax sale made by the United States, marshal in 1806 to H. J. Gambill of the tract of land in controversy, his conveyance thereof to said purchaser, the successive conveyances thereof down to that to the testator of the appellants, and the open, notorious, and habitual acts of ownership by the said successive alienees, under, to say the least, colorable title, for nearly a century, and the palpable acquiescence therein by John Barclay during his life, and by his heirs since his death, has ripened the title so acquired and transmitted into a perfect title, that cannot in any way be affected by the claim asserted by the appellee, or by those under whom he claims. The title thus acquired has passed unscathed through three generations of people, and its validity has never been questioned, except on three occasions now to be referred to. Nearly 70 years prior to the institution of the present suit, one Abraham Joseph asserted a claim under a junior grant to a part of this land. Asher Waterman, the then occupant, brought his action of ejectment in the superior court of Rockingham county against said Joseph, and in said action recovered the land in controversy. Later, Asher Waterman brought an action of trespass against the same Abraham Joseph in respect to this same 93,000 acres of land,

and in that action Waterman prevailed. Still later, and
during the ownership and occupancy of this tract of land by
Augustus Waterman, one Blaine asserted claim to part
thereof, and by agreement between Augustus Waterman and
said Blaine, the parties to said controversy, the whole matter
was submitted to the arbitrament and award of that able and
painstaking lawyer, Green B. Samuels, who was afterwards
an honored and honorable member of this court ; and in the
year 1843 he rendered his award in favor of Waterman, as
the owner of the land by title paramount.  The result of those
controversies, which arose many years ago, and when the
circumstances attending the sale of this land by the United
States marshal were doubtless fresh in the memory of many
living men, powerfully vindicate the validity of the tax title
here in question, and under which the testator of the appel-
lants and those under whom he claims have occupied, used,
and enjoyed the land for now nearly 90 years.  Such has
been the open, notorious, and habitual acts of ownership in
respect to this tract of land that it long since acquired a local
designation.  Persons who have lived on and near the land
from infancy to old age testify that they never heard of the
Barclays, and that they have always known the land as
the "Waterman Survey."  So well known is the land by the
name of the "Waterman Survey" that a description of it by
metes and bounds in a deed conveying the same would be
unnecessary.  In Hutchinson on Land Titles (section 395)
it is said :  "But a description by metes and bounds is not
necessary when the premises are well known by name," etc. ;
citing a number of authorities, and among them Snapp v.
Spengler, 2 Leigh 1, and Beverley v. Fogg, 1 Call 484.

Moreover, under the title in question, numerous smaller
tracts, parts of the Waterman survey, have been sold and
conveyed, and the purchasers thereof have recorded convey-
ances, which were properly recorded, have been put in pos-
session, and have built on, cultivated, and improved their

premises, respectively, and have occupied, used, and enjoyed the same for many years without challenge or molestation from any source.   John Josephs, a witness for the appellee, testifies that he has known the south end of the tract since he was 12 years old ; that it was always called the "Waterman land" ; that his father, who had died four years previous, was then 84 years old, and that he had frequently heard him say "Gus Waterman"—meaning Augustus Waterman—leased parts of the land to persons to get out shingles and lumber, and gave personal supervision and attention to the protection of the land against all depredations ; that the land recovered by Waterman from Blaine was sold to his father by Waterman, and Waterman said that the judgment which he had obtained against Blaine for trespass belonged to his father, and he gave this judgment to Waterman for the privilege of working the timber to the · head of the hollows ; that Waterman also had a man named David Ray working timber on the land under contract. Melvina Hulvey, another witness for the appellee, shows occupancy for a great number of years, under sales by Waterman, at the north end of the survey, and never heard of any Barclays, and never heard of any one except the Watermans and those claiming under them exercising ownership over the land.   Sol. Gladwell, another of the appellee's witnesses, shows the public notoriety of Waterman's habitual exercise of acts of ownership and enjoyment, and also the employment of witness by Lennig as his agent. Dr. Ruffner shows that Augustus Waterman's chief income for many years was from the lease and sale of smaller tracts within this large one, and that he let timber rights, cattle ranging, etc.; that he received shingles and cooper stuff in payment for rent;  that he had tenants and agents living on the land in different sections, and that many of the timber men made contracts in advance with Mr. Waterman, or his agents, and that he heard the names of tenants and agents,

but cannot recall them.    In addition to these open and notorious evidences of occupation, use, and enjoyment, there is the regular succession of conveyances, to wit : That from the United States marshal to Gambill, the purchaser at the tax sale; that from Gambill to Asher Waterman; the will of Asher Waterman, devising this land to his heirs, of whom Augustus Waterman was one, and the conveyance by the heirs of Asher Waterman other than Augustus to the latter, and the conveyance by the heirs of Augustus Waterman to Charles Lennig, the appellants' testator.    And there are these further evidences of open and notorious claim of ownership :    First, the power of attorney executed by Augustus Waterman to Timothy Green in 1811 ; Augustus Waterman's deed to James Hopkins, in 1842, for 900 acres of this tract of land ; the deed of Augustus Waterman to Jacob Bowman, in 1843, for 210 acres of same ; the sale to Josephs in 1843 ; the deed from Augustus Waterman to James A. and William Harriss, in 1847, for 200 acres ; the deed from same to Arch Hopkins, in 1847, for 161 acres ; the verbal contract of sale between Augustus Waterman and George Shoemaker, in 1848, for 100 acres, under which contract Shoemaker paid part of the purchase money, was put in possession, and built, improved, and cultivated the same, and has continuously occupied, used, and enjoyed the same ever since, but in subordination to the Waterman title, he never having paid the balance of the purchase money, and therefore has never received any deed ; the deed from Augustus Waterman to James Hetzel, in 1850, for two tracts ; also, the deed from same to D. R. and Arch Hopkins (two tracts), 150 acres.    Moreover, it was stated in argument, and not denied, that numerous other sales and conveyances were made by Augustus Waterman, which have not been copied into the record.    Add to all these the several contracts and agreements between Charles Lennig and others since said Len-

nig became owner of this land, all of which, together with the several conveyances heretofore referred to, and constituting the unbroken chain of title under which Lennig, the appellants' testator, claimed, and all of which, except the conveyances of parts of this tract by Augustus Waterman as above set forth, are recited in the complainant's bill, and can it be said that these numerous evidences of continuous occupation, use, and enjoyment for nearly 90 years ; these continuous, open, notorious, and habitual acts of ownership, under a continuous claim of ownership,—are not in every respect fully equivalent to an adversary possession, evidenced by actual, continuous residence, cultivation, and improvement ? In the light of well-settled principles, we think not.

In Taylor v. Burnsides, 1 Gratt. 165, Judge Baldwin, at page 192, clearly defines adversary possession and the essential elements thereof. He says : "An adversary possession must also be actual, in reference to the means by which it is acquired. In that sense, I understand an actual possession to be the occupation, use, or enjoyment of the subject-matter of controversy, by residence, cultivation, improvement, or other open, notorious, and habitual acts of ownership. Of occupation, use, or enjoyment, residence, cultivation, and improvement, respectively, while they continue, are usually the most obvious and decisive. But there may be other open, notorious, and habitual acts of ownership, of quite equivalent import and effect. Take, for example, the case of a town resident who, claiming title to a lot or tract of woodland in the vicinity, openly, notoriously, and . habitually cuts and hauls from it his necessary supplies of fuel, or in like manner makes it a source of revenue, by sales of firewood or timber ; or the case of an uninclosed or unimproved lot in or near a city, devoted by the professed owner to his use or profit as a coal or lumber yard, quarry, or landing place. There cannot be stronger instances of

actual possession than these, and other like cases which might be stated ; but they can serve only for the purpose of illustration. When we leave the unquestionable tests of residence, cultivation, and improvement, every case must depend in a great measure upon its own circumstances, and requires a recurrence to the general principle, above stated, of open, notorious, and habitual acts of ownership. That principle must, moreover, be guarded in its application by taking care not to confound an adverse claim with an actual possession, and by distinguishing between repeated trespasses, under a pretense or even belief of title, and the dominion, control, and enjoyment of actual or apparent ownership. That an adversary possession requires actual occupancy, or what is equivalent to it, is sustained by an overwhelming current of American decisions. * * * There is no case, I think, which, when closely examined, will be found in opposition to this doctrine, unless it be that of Ewing v. Burnet, 11 Pet. 41. And, if impugned in that case, it is by some of the reasoning, and not by the opinion of the court." Judge Baldwin then proceeds to state the case of Ewing v. Burnet, as follows : "It was an action of ejectment, in which the verdict and judgment were for the defendant. The property in controversy was a lot in the town of Cincinnati, incapable, from the character of its surface, of being inclosed, unfit for cultivation, and without any building or other improvement upon it. Its only value was for the sand and gravel, and the taking and removing thereof the only use to which it was applied. The evidence tended to prove the open, notorious, and habitual use of it by the defendant in that way for upward of twenty years, and that his use of it by himself and his lessees was exclusive, except occasional trespasses by others, which he prohibited, and for which he sought redress by actions of trespass." The opinion in Ewing v. Burnet, *supra*, was delivered by Mr. Justice Baldwin, of the United States supreme court, while that in Taylor v. Burnsides,

*supra,* was delivered by Judge Baldwin, of this court; and as it becomes necessary to compare these two opinions, for the purpose of showing that, as respects the essential elements of adversary possession, there is no practical difference between them, we will, for convenience, refer to them as Mr. Justice Baldwin and Judge Baldwin. Now, after the remarks above quoted, Judge Baldwin, after some comments on the opinion of Mr. Justice Baldwin in Ewing v. Burnet, not pertinent to the present inquiry, proceeds to quote from the opinion of Mr. Justice Baldwin, and to criticise his remarks as follows: "It is well settled that to constitute adverse possession there need not be a fence, building, or other improvement made. It suffices for this purpose that visible and notorious acts of ownership are exercised over the premises in controversy for twenty-one years after an entry under claim and color of title. So much depends on the nature and situation of the property, the uses to which it can be applied, or to which the owner or claimant may choose to apply it; that it is difficult to lay down any precise rule adapted to all cases. But it may with safety be said, that where acts of ownership have been done upon land which from their very nature indicate a notorious claim of property in it, and are continued for twenty-one years, with the knowledge of an adverse claimant, without interruption, or an adverse entry by him, for twenty-one years, * * * and actual adverse possession against him, if the jury shall think that the property was not susceptible of a more strict or definite possession than had been so taken and held. Neither actual occupation, cultivation, or residence are necessary to constitute actual possession when the property is so situated as not to admit of any permanent useful improvement, and the continued claim of the party has been evidenced by public acts of ownership, such as he would exercise over property which he claimed in his own right, and would not exercise over property which he did not claim." The criti-

cism of Judge Baldwin is as follows : "Now, what the court thus said, in relation to acts of ownership sufficient to prove an ouster and continued adverse possession, may be very true in reference to the case before it ; was the result of a combination of the circumstances of that case, and required the actual knowledge of them by the other party. But, with great deference, it seems to me it is not a safe guide, if so intended, as furnishing rules to ascertain what is an adverse possession, for the language employed, if taken abstractly, would serve to indicate an adverse claim rather than an adverse possession.    That acts of ownership on the property indicate an adverse claim is not, as I humbly conceive, sufficient, unless they amount to an adverse possession ; that is, to the occupation, use, or enjoyment of the premises.    Nor is it sufficient that they show a continued claim of the party, such as he would exercise over property which he claimed in his own right, and would not exercise over property which he did not claim.    Such language strikes me as remarkably loose and indefinite, and as calculated to occasion darkness instead of light, which, I think, must be the result of any attempt to give it a practical application as a test of adverse possession."

Counsel for the appellee, seizing upon this criticism by Judge Baldwin, and evidently misled thereby, comes to the conclusion that the doctrine of adversary possession is incorrectly laid down by Mr. Justice Baldwin in Ewing v. Burnet, and has been repudiated by the courts of this and other states.    This is obviously a mistake.    The doctrine laid down by Mr. Justice Baldwin in Ewing v. Burnet is that held by the supreme court both before and since that decision, and, consequent thereto, has been reaffimed by Mr. Justice Clifford in Harris v. McGovern, 99 U. S. 161, decided in 1878 ; by Justice Field in Fletcher v. Fuller, 120 U. S. 534, 7 Sup. Ct. 667, decided in 1887 ; and by Chief Justice Fuller in Coal Co. v. Doran, 142 U. S. 417, 12 Sup. Ct.

239.   In the case last mentioned the very language which counsel for the appellee has characterized as an "unguarded expression" is by the learned chief justice quoted *verbatim*. As respects the doctrine of adverse possession, and the elements essential to constitute it, there is practically no difference between the statement of the rule by Mr. Justice Baldwin in Ewing v. Burnet and that by Judge Baldwin in Taylor v. Burnsides.   The two cases are often quoted side by side without any adverse criticism of the former.   It is, perhaps, true that Judge Baldwin's statement of the rule is more clear and compact than that of Mr. Justice Baldwin, and that the illustrations given by the former are happier than those given by the latter ; but their statements, when taken together, import one and the same thing.   Judge Baldwin says : "I understand an actual possession to be the occupation, use, or enjoyment of the subject-matter of controversy, by residence, cultivation, improvement, or other open, notorious, and habitual acts of ownership.   Of these modes of occupation, use, or enjoyment, residence, cultivation, and improvement, respectively, while they continue, are not always, but usually, the most obvious and decisive.   But there may be other open, notorious, and habitual acts of ownership of quite equivalent import and effect."   And Mr. Justice Baldwin, with less amplitude of statement, and omitting the words "residence, cultivation, and improvement, the usual, most obvious, and decisive tests of occupation, use, or enjoyment," and speaking with reference to the case in hand, covered all the ground necessary in that case by saying:   "It is well settled that to constitute an adverse possession there need not be a fence, building, or other improvement made.   It suffices for this purpose that visible and notorious acts of ownership are exercised over the premises in controversy for twenty-one years [the statutory period] after an entry under claim and color of title," etc.   And all of the language criticised by Judge Baldwin is predicated of the

language of Mr. Justice Baldwin last above quoted, and is referable to the case the learned justice had under consideration, in which, as in the present case, actual residence, cultivation, and improvement by the owner or claimant were out of the way, and in which, as here, the question was whether the occupation, use, and enjoyment, by ''visible and notorious acts of ownership,'' came up to the requirement expressed by Judge Baldwin in the words ''or other open, notorious, and habitual acts of ownership'' so as to constitute an adversary possession for the statutory period. We fail, therefore, to perceive the justness of Judge Baldwin's criticism of the language and reasoning of Mr. Justice Baldwin ; we fail to perceive in the reasoning any tendency to confound an adverse claim with an actual possession, or any failure to distinguish between repeated trespasses, under either a pretense or belief of title, and the dominion, control, and enjoyment of actual or apparent ownership. Again, Judge Baldwin says : ''When we leave the unquestionable tests of residence, cultivation, and improvement, every case must depend, in a great measure, upon its own circumstances, and requires a recurrence to the general principle, above stated, of open, notorious, and habitual acts of ownership.'' Precisely the same principle is stated by Mr. Justice Baldwin, as follows : ''But it may with safety be said that where acts of ownership have been done upon land, which from their nature indicate a notorious claim of property in it, and are continued for twenty-one years, with the knowledge of an adverse claimant, without interruption, or an adverse claim by him, for twenty-one years, such acts are evidence of an ouster of a former owner, and an actual adverse possession against him,'' etc. Now, this must, in the nature of things, be so ; for while it is true that, of the different modes of use, occupation, or enjoyment, those of residence, cultivation, and improvement are the most obvious and decisive, yet there are other acts of open, notorious, and

habitual ownership,—or, as Mr. Justice Baldwin expresses
it, "visible and notorious" acts of ownership,—exercised
over the premises in controversy for the period necessary
to constitute the statutory bar, after an entry under claim
and color of title. Obviously, the two forms of expression
convey one and the same idea; for "visible and notorious"
acts, for the statutory period, are the full equivalent of
open, notorious, and habitual acts for the same period; and
whether the one or the other, if the acts proved are suffi-
ciently strong to clearly indicate that the claimant entered,
used, and enjoyed the premises, with the intention of hold-
ing against all the world, then such acts constitute an actual
adverse possession. It is clear that there is no substantial
difference in the statements of the judges as respects the
underlying principles of actual adverse possession. But if
a real and substantial difference did exist, then the doctrine
laid down by Judge Baldwin in Taylor v. Burnsides, *supra*,
is quite sufficient for a just decision of this case.

It should be borne in mind that, prior to the emanation
of the title under which the testator of the appellants claimed,
the title of John Barclay, the original grantee, had become
delinquent, and was forfeited and was extinct, by reason
whereof the land was sold and conveyed by the United States
marshal; that it was not only delinquent and forfeited by
reason of the nonpayment of the United States direct tax
lawfully charged thereon, but was delinquent and forfeited
by reason of the nonpayment of the taxes lawfully assessed
thereon by the state from the year 1797 to the year 1806,
inclusive, not one cent of which was ever paid; that since
1806 this land has never been on the land books in the name
of John Barclay, or of any one claiming under him; that
from 1806 down to the present time the land has been regu-
larly on the land books in the names of the testator of the
appellants and those under whom he claimed, and they have
regularly paid all the taxes assessed thereon; that not only

have no taxes on said land ever been paid by John Barclay or his heirs, or by any other person for him or them, but neither said Barclay nor his heirs have ever taken any steps to redeem or reclaim said land, or asserted any claim or right to do so, until the institution of this suit, although a period of time has elapsed a great many years in excess of the period necessary to constitute the statutory bar. The constitutionality of ever forfeiting land as delinquent for nonpayment of taxes has been repeatedly held by this court. See remarks of Lee, J., in Wild's Lessee v. Serpell, 10 Gratt. 408, and cases cited. In order to consummate and perfect a forfeiture in such a case, no judgment or decree or other matter of record is necessary. The statutes profess *a proprio vigore* effectually to divest the title out of the defaulting owner, and perfectly to vest it in the commonwealth ; so that, John Barclay's title having become extinct by reason of forfeiture, and there never having been any redemption, there remained in him no vestige of title to pass to his heirs in any way. As to the effect of such forfeiture, see Hutch. Land Titles, § 78, and authorities cited. Hence, at the time of the emanation of the tax title under which the appellants' testator claimed, the title of John Barclay, the original grantee, having become forfeited and extinct, the possession was vacant, and there was no person living who could assert any right to the possession, adverse to that acquired by the appellants' testator, and those under whom he claimed ; and the deeds to them, respectively, constituting color of title, even though defective in both form and substance, and their deeds importing the right of entry and occupation, they entered, used, and enjoyed the premises, and exercised continuously thereover such open, notorious, and habitual acts of ownership as constitute an actual adverse possession against all the world.

These acts of ownership were so open, notorious, and habitual, continuing, as they did, for over 80 years next

1 Va Dec—57

before the bringing of this suit, as to constitute notice, at
least, to all persons who might have any claim whatever to
the land in controversy.   But the circumstances disclosed by
the record clearly indicate that the appellee, J. K. White,
purchased the one-ninth interest which he claims to own with
actual knowledge of the title under which the testator of the
appellants claimed.   He purchased his claim in the city of
Philadelphia, where most of the numerous descendants of
John Barclay lived.   The interest obtained by him was that
of Mrs. Harriet Biddle Fox, the wife of De Grass Fox, and
a remote descendant of John Barclay.   The other heirs either
disclaimed any right, title, or interest in the land in question
or for other reasons declined to embark in this novel enter-
prise of the appellee, Mr. J. K. White.   The Barclays and
Biddles are noted families in the city of Philadelphia, and
extensively connected by marriage.   Judge George W. Bid-
dle, one of the Barclay heirs, and a witness for the appellee,
being asked if he knew whether his grandfather, John Bar-
clay, had any interest in any Virginia lands in his lifetime,
answered :   ''I have heard that he had, but I had no reason
to believe it, except from being pestered very often to make
deeds, which I have never done.''   On cross-examination he
was asked :   Q. ''I understand you to say that you had
heard some rumors to the effect that Mr. John Barclay had
some lands in Virginia, but that you had no reason to believe
that he had any title to them, except that you had been pes-
tered very frequently to sign deeds, which you have refused
to do.''   A. ''That statement is correct.''   Q. ''Will you
be kind enough to state when was the last time you were
applied to on this subject, and state the circumstances.''   A.
''I am under the impression it was in the present year, 1890.
It may have been 1889.   I think 1890.   I was asked if I
would sign some deed conveying my supposed right, title, and
interest in said land to some one.   After talking the matter
over with my cousin, Clement B. Barclay, we both con-

cluded we would have nothing to do with it." Q. "Well, then, I understand that you do not claim any title at all to this land." A. "I never have made, nor now make, any claim to any such supposed lands." Judge Biddle also says he is under the impression that he had heard that such supposed lands, or parts of them, had been sold under proceedings which in the state of Pennsylvania are termed "tax sales." Doubtless the Barclay heirs frequently conferred with Judge Biddle, a prominent member of the family, and a lawyer of note, and availed themselves of his superior information, and professional knowledge and skill; in fact, it is plain, from the deposition of Mr. Arthur Biddle, a son of Judge Biddle, and a great-grandson of John Barclay, that such was the fact. Arthur Biddle was also a witness for the appellee. He testifies that these lands were frequently the subject of conversation in his family, and with the family connections, descendants of John Barclay, and that it was a subject of notoriety in the family, being sometimes discussed in the way of gossip, and at other times as a matter of business. Now, the appellee, J. K. White, must have made quite a close canvass of the Barclay heirs, and, although he got but one recruit, that circumstance of itself indicates strongly that the others, constituting quite a number of persons, like Judge George W. Biddle and Mr. Clement B. Barclay, disclaimed any interest, and refused to have any connection with the transaction. Again, the deed from Fox and wife to the appellee, White, was procured on the 8th day of May, 1890 ; on the 22d day of the same month the bill had been prepared, reciting the numerous deeds constituting the chain of title under which the testator of the appellants claimed, setting forth the contracts of record in the bill mentioned, tracing the tax titles and claim thereunder from the sale and conveyance by the United States marshal down to Charles Lennig, and averring his claim thereunder ; and on the 24th day of the same month the bill

was filed, and process issued thereon. Thus, after a repose as still as death, and acquiescence for over 80 years, all at once the appellee, J. K. White, succeeds in arousing one of the slumbering heirs of John Barclay, and this monstrous claim is asserted by a bill in equity, which on its face shows the utter poverty of the claim,—a poverty which is equaled only by the audacity of the claim.

In view of all the circumstances disclosed by the record, the conclusion is irresistible that the appellee became the so-called purchaser of the claim asserted by him purely as a matter of bold adventure and speculation, and that he made the so-called purchase with full knowledge of the adverse claim of the testator of the appellants, which had stood unchallenged and uninterrupted for over 80 years. Notice may be actual or constructive, and, whether the one or the other, the result is the same. It is the settled doctrine that whatever circumstances are sufficient to put a purchaser upon an inquiry, which, if pursued, would lead to the requisite knowledge and information, are sufficient to charge him with actual knowledge of the facts to which such circumstances would lead him ; or, in other words, he must look to the title papers under which he buys, and is charged with notice of all the facts appearing upon its face, or to the knowledge of which anything appearing there will conduct him. Or, in the yet more appropriate and expressive language of Mr. Justice Strong, in De Cordova v. Hood, 17 Wall. 1, where that learned judge said : "Whenever inquiry is a duty, the party bound to make it is affected with knowledge of all which he would have discovered had he performed the duty. Means of knowledge, with the duty of using them, are, in equity, equivalent to knowledge itself." See, also, Long v. Weller, 29 Gratt. 347 ; Wood v. Krebbs, 30 Gratt. 708 ; Coles v. Withers, 33 Gratt. 186 ; Lamar's Ex'r v. Hale, 79 Va. 147 ; Hurn v. Keller, Id. 415 ; Effinger v.

Hall, 81 Va. 94; Wood v. Carpenter, 101 U. S. 135.     In
Effinger v. Hall, *supra,* Lewis, P., says: "A strong case
on constructive notice is Armentrout's Ex'rs v. Gibbons,
30 Gratt. 632.     There a deed reserving a vendor's lien was
duly recorded, and afterwards the record of the deed was
destroyed.     It was held that the constructive notice afforded
by the recordation of the deed was equivalent to actual notice
of the existence of the lien, notwithstanding the destruction
of the records."     So, in the present case, the avenues of
information have for over 80 years been open and accessible.
For all this period the public records of Rockingham county,
where most of the land in controversy is situated, have
teemed with evidences of the claim asserted by the testator
of the plaintiff, and those under whom he claimed, and during
all which time they have exclusively occupied, used, and
enjoyed the premises, without interruption, as evidenced by
their continued, open, notorious, and habitual acts of owner-
ship, quite equivalent in import and effect to occupation,
use, and enjoyment, evidenced by residence, cultivation,
and improvement.     Had John Barclay, during his lifetime,
or those claiming under him, since his death, come forward
and asserted their rights in due time and form, they might
have reclaimed this land which had been sold as delinquent
for the nonpayment of the United States direct taxes, law-
fully charged thereon; but this manifest duty they failed to
perform, and sat supinely down and neglected to pay the
lawfully assessed taxes, neglected to take any steps to redeem
the land, and now come admitting the sale of the land as
delinquent, admitting the sale and conveyance by Scott, the
marshal, to Gambill, and tracing, by a regular succession
of conveyances, the title down to Charles Lennig, the testa-
tor of the appellants, and only assail the title thus derived
by alleging in their bill in a general way, without specify-
ing any particulars, that the United States marshal did not
comply with the law in making said sale, and that therefore

the said sale and conveyance, as well as all other convey-
ances and devices constituting links in said chain of title, are
invalid and void.

It is in proof that the most diligent and laborious search
has been made in the different departments of government,
federal and state, and in every other direction where there
could be the least hope of discovering any evidence of the
regularity of the tax sale ; but, after the lapse of so many
years, it has been impossible to discover all the evidence
necessary to show affirmatively that said sale was made, in
every particular, in conformity to the requirements of law.
Moreover, it is in proof that the private papers of the two
Watermans were many years ago destroyed by fire.      The
law required the marshal in such cases to return and file in
the district court at Richmond the report of sale, who was
the purchaser, and the amount for which the land was sold,
with other evidences of the regularity of the sale.      In all
probability, the papers necessary for the purpose would
have been found in the clerk's office, or among the papers
of that court ; but, unfortunately, as the proof shows, a large
quantity of the papers of that court and office were consumed
in the great conflagration which added so  much terror
to the closing scenes of that great civil strife which devas-
tated and impoverished this commonwealth throughout her
borders.      Was it possible to do more than was done to pro-
tect the title in question ?   We think not.   In respect to
said tax sale, and in view of the peculiar circumstances of
hardship attending this case, and the great lapse of time and
seeming acquiescence on the part of John Barclay and those
claiming under him, and the apparent abandonment of all
claim on their part, it will be presumed that all was done
that the law required to be done, and that said sale was regu-
lar and valid.   In Black on Tax Titles (2d Ed. § 461) it is
said :   "Mere lapse of time will not, of itself, afford pre-
sumptive evidence of the regularity of a tax sale, if the pur-

chaser and those claiming under him have not had possession under the deed ; that is, the antiquity of a tax deed, if no possession has been taken under it, affords no presumption in its favor, but, on the contrary, operates the more strongly against the holder.   But where the tax purchaser has been in possession the case is different.   Here the responsibility for failure to institute proceedings to test the validity of the title rests alone upon the original owner.   It would be unfair to raise a presumption against the purchaser in consequence of his omission to do that which he was under no obligation to do, except, indeed, as a means of making doubly sure a claim in which he may reasonably be supposed to have had confidence.   And, on the other hand, it seems perfectly just to cast an implication on the owner, to the effect that his failure to make any attempt to rescue his land, during a considerable number of years, from the consequences of the tax sale, could only be attributable to his knowledge of the fact that such an attempt would result in demonstrating the validity of the tax title.   We have, therefore, no difficulty in assenting to the statement that an ancient tax deed and its recitals, together with long-continued and uninterrupted possession, are evidence from which compliance with the statute in regard to tax sales may be presumed, and the question thereon is one for the jury upon all the evidence in the case."

It would be useless to adduce arguments and quote authorities to show the peculiar appropriateness of the principle above stated to the case in hand.   We do not assert the proposition that in the present case the marshal's deed is *prima facie* evidence of title ; and, while it may not be such, yet we do assert that it constitutes color of title under which the testator of the appellants and those under whom he claimed entered upon and enjoyed the premises ; not by actual residence, cultivation, and improvement, but by "other open, notorious, and habitual acts of ownership," exercised con-

tinuously for the full period of the statutory bar, and has thereby ripened into a complete and perfect title. In 2 Blackw. Tax Titles, § 1112, commenting on certain cases, the author says : "In both these cases there was a long and uninterrupted possession, under the tax title ; and the party in whose favor the presumption was extended was not the original purchaser at the tax sale, but an innocent person, who, for aught that appears, had no notice in fact of the irregularities in the proceeding. And the court places the presumption upon the ground that the jury must be 'satisfied that the deficiencies in the evidence are not chargeable to the fault or negligence of the party,' and that no better evidence within the power of the party 'is willfully withheld.' This doctrine cannot, therefore, be extended to the original purchaser, 'for he is bound to collect and preserve the evidence' upon which the validity of his title depends ; and, if he has failed to do so, it is his own folly. Again, it will be observed that the rule as laid down in the case cited requires good faith, and a diligent and thorough effort on the part of the person claiming the benefit of the presumption, in collecting all the evidence which can be produced, tending to throw light upon the regularity of the original proceedings of the officers. Strict search must be made in all the offices and places, and inquiry made of all persons, for the documents and facts necessary to establish the validity of the title. The presumption is not raised for the purpose of supplying any defect in the doings of the officers, but to fill up the gap occasioned by a supposed loss of testimony, which, if it had been preserved, would have established, to the satisfaction of the court, the existence of the very prerequisite in question." The present case comes squarely within the principle above stated. Here, the party whose title is assailed, upon the supposed ground of irregularity in the tax sale, was not the original purchaser at that sale, and is, to that extent, entitled to the

benefit of the rule.    Nor can it be said that any deficiency in the evidence is attributable to his fault ; nor that any better evidence within his power is willfully withheld ; nor that most anxious, diligent, and thorough search has not been made, in order to discover the papers which would certainly vindicate the validity of the tax title.    Again, it is said : "A tax deed, founded upon an actual sale, and purporting by apt words to convey the title to the real estate therein described to the grantee, will give color of title notwithstanding it may be defective in form or substance, or be founded on proceedings so irregular or defective as not to pass the true title.    We do not at present speak of a deed void on its face, but all the authorities we have cited will sustain the rule above given, if the tax deed is at least apparently fair.    Thus a tax deed gives color of title, although the judgment on which it is founded be fatally defective.    And possession of land in good faith well may be under a sufficient color of title, though it be under a tax sale not preceded by any advertisement thereof." Black, Tax Titles, § 503, citing Pillow v. Roberts, 13 How. 472 ; Flanagan v. Grimmet, 10 Gratt. 421.    So, where land was sold by a commissioner under the delinquent land laws, it was said : "He acts like a commissioner to make sales under a decree of the chancery court, and is clothed with a mere naked authority.    Having no interest in the land conveyed, the deed of the commissioner would avail nothing, where his authority to make it did not appear, unless there had been such a long acquiescence and possession under the deed as to justify a presumption in favor of the deed." Walton v. Hale, 9 Gratt. 197, 198.    Perhaps no case, more than this, ever demanded every reasonable presumption in favor of a tax sale, and title thereunder.    It is, indeed, a very remarkable case, one in which the record discloses not a single circumstance favorable to the decree of the court below.    It is, in fact, nothing other than an action of eject-

ment in equity. The argument has proceeded almost entirely upon the law applicable to an adversary possession, and upon this ground alone the court below might well have sustained the demurrer, upon the familiar principle that where a party has an adequate and complete remedy at law a court of equity will not sustain him. But as to the demurrer, and these several specific grounds assigned therefor, we decide nothing, inasmuch as this proceeding is under section 2562, Code 1887, and it is insisted that the jurisdiction of a court of equity, in proceedings for partition under said section, is not restricted to tenants in common, joint tenants, and coparceners, as the language so plainly indicates, but that persons claiming adversely to all those seeking partition may be covered in the same suit, and that such court may take cognizance of all questions of law arising between them ; and inasmuch as several comparatively recent decisions of this court are relied upon by counsel for the appellee to sustain his contention ; and inasmuch as a discussion of the questions arising on the demurrer would be untimely, after having considered and passed upon the merits of the case, and would necessarily involve a lengthy review of the cases referred to, which could serve no good purpose now,—suffice it to say that while the writer is firmly convinced that a court of equity has not jurisdiction in this and like cases, and that the authorities relied upon do not sustain the position contended for by counsel for the appellee, yet, for the reasons stated, and others that need not be mentioned, we decide nothing touching the proper construction of said section 2562.

In conclusion, it only remains to say that in the light of all the facts disclosed by the record, it is undeniably true that the conduct of John Barclay and his heirs from the time of the tax sale to the bringing of this suit has been such as is consistent only with an absolute abandonment, with complete notice of all the circumstances, of all claim to the land

in controversy ; that the appellee makes no case by his bill entitling him to have partition of the land,, as prayed for in his bill, or to any relief in a court of equity ; and that it would be a great and unconscionable wrong to now permit him to wrest this land from its rightful owners, when they have lawfully occupied and used and enjoyed it without interruption and without challenge for nearly a century, during which time three generations of people have gone to their graves.    For the reasons given above, the decree appealed from should be reversed and annulled, the injunction dissolved, and such decree entered here as the court below should have entered.    Decree reversed.

LACY and FAUNTLEROY, JJ., absent.